**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

**ERNEST MONTGOMERY**                                                  **PLAINTIFF**

**V.**                          **CIVIL ACTION NO. 5:11-cv-00004-DCB-JMR**

**WARREN COUNTY, DEPUTIES BILLY HIGGINS,
MICHAEL HOLLINGSWORTH AND CHRIS SATCHER,
IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES**                 **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

On December 27, 2011, the Court entered an order denying the Defendants' Motion to Dismiss based on qualified immunity and granted the Plaintiff's Motion to Amend. <u>See</u> Order, docket no. 21. The Defendants appealed this Order, but the appeal was dismissed. <u>See</u> Mandate, docket no. 30. Upon remand, the Parties conducted limited discovery as to the issue of qualified immunity. Now, the Defendants have individually filed Motions for Summary Judgement [**docket nos. 41, 43**], which bring this cause again before the Court. Having carefully considered these Motions, the Plaintiff's opposition thereto, applicable statutory and case law, and being otherwise fully advised in the premises, the Court finds that the Defendants are entitled to qualified immunity and will therefore grant their Motions.[1]

---

[1] Montgomery objects that the Defendants' Motions are untimely and asks the Court not to consider them. The Defendants' Motions were indeed a few days late. Nevertheless, the Court has the discretion to entertain them and will do so. <u>Edwards v. Cass Cnty., Tex.</u>, 919 F.2d 273, 275-76 (5th Cir. 1990). There is no indication that the Plaintiff was prejudiced because the Defendants filed their Motions late.

### THE DIFFERENT STORIES

*The Defendants' Version*. On November 26, 2009, an unidentified source notified the Warren County authorities of a vehicular hit-and-run and reported the fleeing vehicle's location to the 911 dispatcher. Hollingsworth Depo. at 14. In response, Defendant Warren County Sheriff Deputy Satcher went to the scene of the accident to investigate, and Defendant Warren County Sheriff Deputy Hollingsworth went to the fleeing vehicle's reported location.[2] There, Hollingsworth found Plaintiff Earnest Montgomery sitting in the suspected vehicle, which was parked outside his girlfriend's apartment. Hollingsworth Depo. at 15. When Hollingsworth approached the car, Montgomery exited—apparently appearing compliant—but then fled on foot into the woods behind the apartment. Id. at 15. Hollingsworth chased him. According to Hollingsworth, Montgomery ran a short way into the woods but then tripped and fell to the ground. Id. at 15. Hollingsworth "got on his back" and attempted to handcuff him, but, in Hollingsworth's words, Montgomery "fought extremely." Id. at 15.

Sometime during the beginning of the foot pursuit, Defendant Warren County Sheriff Deputy Heggins arrived as backup and followed the two into the woods. Heggins Depo. at 11, 12, 16.  According to his testimony, Heggins caught up with the two just as Hollingsworth

---

[2]   Apparently, the unidentified source followed the fleeing vehicle and reported its location to the 911 dispatcher. Hollingsworth Depo. at 14.

was attempting to handcuff Montgomery. Id. at 20. Heggins placed his foot on Montgomery's back because it appeared to Heggins that Montgomery was going to get up. Id. at 20, 23. When it became apparent that Montgomery indeed was going to escape before Hollingsworth could handcuff him, Heggins tased him once in order to get him "under control." Id. at 25; Hollingsworth Depo at 15. Even after being tased, Montomgery continued to fight with the Deputies, which prompted Heggins to use the taser on Montgomery a second time. Heggins Depo. at 25; Hollingsworth Depo. at 15. Hollingsworth then was able to handcuff Montgomery. Shortly after the Deputies emerged from the woods, Hollingsworth noticed that Montgomery had fallen onto "concrete" and "messed his face all up." Hollingsworth Depo. at 16. Neither Deputy testified to striking, hitting, or punching Montgomery in the face.

*Montgomery's Version*. Montgomery's version of what happened is more difficult to follow because of its incoherent chronology and vague details. First, his testimony about what precipitated his flight into the woods is contradicted by the testimony of his then-girlfriend, Marquita Scott, who witnessed the pre-and-post-arrest events. Montgomery testified that as he was exiting his vehicle at least five police vehicles arrived at his girlfriend's apartment and at least five sheriff deputies, who may have been wearing black masks, exited their patrol cars with guns drawn. Mont. Depo. at 19, 21, 22. He further states that he was fearful because he was

3

holding his "daughter" at the time. Id. at 17. But Scott, who witnessed these same events, confirmed that only one deputy initially appeared at the scene. She also claimed that her daughter, not Montgomery's, was inside the house at the time the first deputy arrived, and she stated that this deputy never drew his gun. Scott Depo. at 11-12, 26-27.

As for what transpired after he fled from the allegedly masked deputies, Montgomery is not clear or consistent. The core of Montgomery's excessive force claim is that a number of unidentified deputies beat him unnecessarily while they were in the woods. According to Montomgery, these deputies broke his nose and his eye socket in addition to pulling out a plait of his hair. Id. at 35, 92. But apart from his general belief that he was beaten unnecessarily by unspecified deputies, Montomgery cannot provide any specific details of the incident and consistently claims that he could not remember how the events unfolded because he was "unconscious" for most of the time during which the events occurred.

For example, because he claims to have been "unconscious," he cannot say with any certainty whether he fell while in the woods or whether he fell onto a concrete object. First, he insists that he did not fall to the ground. Id. at 26. Then, he claims that he cannot remember. Id. at 27. Finally, he states that "after they struck me, I think—I'm thinking I was—I had to have fell down, you

know." Id. at 85. Again, because he claims to have been "unconscious," he cannot tell how many deputies hit him and which deputies hit him. He testifies that the number of deputies was "four, five. More than one, more than two." Id. at 28. And he later adds that four or five "bald" deputies struck him. Id. at 29-30. Finally, because he claims to have been "unconscious," he cannot tell exactly how many times these deputies used the taser or what the deputies hit him with. Id. at 23, 25, 26, 27. He initially claims that he was tased more than twice—"two in the chest and two in the back." Id. at 23. But when pressed on the details, the only tasing he describes in the entire deposition is the one that occurred when the Deputies were initially trying to handcuff him. As to how he was beaten, during cross-examination he first states:

> Don't recall. I don't know if it was one of those black struck things or a flashlight. It was some—a blunt object. I can't recall, you know. I don't know. . . . They could have punched me, too. I was unconscious, man, you know, it's so much I can, you know, remember. You know, I don't just, you know, remember like, you know.

Id. at 26. But during direct examination he changes his story:

> That Taser thing struck me. And, you know, they turned me over, you know, just hit me—you know, hit me in the face. I was unconscious for a minute, but I felt somebody strucking me like—punching in my face, hitting me with, you know, something in my face, you know.

Id. at 84.[3] The most helpful chronological detail that Montgomery

---

[3] The rest of Montgomery's testimony regarding the deputies' behavior is more of the same. It is impossible to understand exactly what Montgomery believes happened, other than he believes that the deputies unnecessarily hit him "several" times in the

provides is that the unidentified deputies handcuffed him after they had allegedly beat him. Id. at 35.

Returning to Scott's testimony, she offers a few additional details about what occurred in the woods, although she could not see what happened. First, Scott states that she heard the taser go off "several" or "five times." Scott Depo. at 44. This testimony is based on her general impression of events and the fact that she heard the taser's "Zzz-zzz-zzz" sound "several" times, which she guesses was "five." Id. at 20, 45. But she also states that she heard deputies telling Montgomery "to get down" before she heard the sounds of the taser. Id. at 20-21. Moreover, she asked Montgomery what "they [did] to him" shortly after he had been arrested, and Montgomery responded that "he fell and hit a brick." Id. at 33. When Scott expressed her doubts, one deputy pointed her to the "big rock" in the woods on which he claimed Montgomery had fallen. Id. at 38. On the morning following the arrest, Scott went into the woods to examine the rock. Id. According to her testimony, she saw spatters of blood on the rock. Id. Asked in her deposition if she then believed that Montgomery injured himself on the rock, she claimed she did not, because, in her view, if the story was true then "he would have been dead." Id. at 39.[4]

face. Id. at 36.

[4] Scott later adds in a post-deposition affidavit that she "noted the blood on both hands of deputy Hollingsworth, as Earnest Montgomery was being placed in an ambulance." See Scott Aff.,

*Video Evidence*. Video evidence, taken from Satcher's car, which arrived at the scene sometime after Hollingsworth and Heggins had begun their foot pursuit of Montgomery, provides no real-time insight into the events as they transpired in the woods but sheds some light on what happened after the three emerged from the woods. The video shows Hollingsworth leading Montgomery out of the woods in handcuffs. By this time, all parties, with the exception of Scott who can be heard yelling "what did you do to him" in the background, were calm. Holingsworth sat Montgomery on the ground in direct view of the camera. Montgomery did not appear to have suffered any shocking wounds but was clearly bleeding from the right side of the head above his eye. While there, the Deputies made an effort to attend to his wounds, which included cleaning it and radioing for medics. They also worked politely with Scott,[5] who eventually calmed down, to find Montgomery's cell phone, which had been lost in the woods. Sometime during this time, Hollingsworth, Heggins, and Satcher discussed what happened to Montomgery's head, with Hollingsworth claiming that Montgomery fell and hit his head on something like a brick or a rock. Satcher directly asked

___

docket no. 66. There are multiple explanations at to how this blood could have ended up on his hands. The Court cannot draw inferences from this testimony favorable to either side.

[5] Montgomery claimed that after the deputies removed him from the woods they were "rude" to his girlfriend and made no effort to attend to his injury. These details are irrelevant to the Court's analysis but underscore Montgomery's shaky recollection of events.

Montgomery, "You do, you do know we didn't do that to you, though, right, you fell and hit a rock, is that right?" Id. at 7. Montgomery responded, "Yeah I fell, yes sir. I was scared." Id. Satcher again asked, "Ok, but you did, you are saying, you know we didn't do that to you, you did fall and hit a rock, is that right?" Id. To which Montgomery again responded, "Yeah I know y'all ain't . . . (inaudible)." Shortly thereafter, this time unprompted by any deputy, Montgomery stated, "Man I fell on something." Id. at 9.

## STANDARD OF REVIEW

"A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010) (citing Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005)). Even though the plaintiff has the burden in this context, because the plaintiff is the nonmovant, all inferences are drawn in his favor. Callahan, 623 F.3d at 253.

**ANALYSIS**

**I. Excessive Force Claim**[6]

The Defendants advance two reasons why they are entitled to summary judgment on the Plaintiff's excessive force claims. First, they argue that Montgomery has not adduced facts sufficient to demonstrate that their actions were objectively unreasonable. Secondly, they argue that Heck v. Humphrey, 512 U.S. 477 (1994), and its Fifth Circuit progeny bars his excessive force claim because this claim necessarily implies the invalidity of his resisting arrest conviction, which was adjudicated by the Warren County Justice Court almost a year after his arrest. The Defendants are right on both arguments.

*A. Qualified Immunity*

In order to overcome the two-pronged qualified immunity defense in the context of an excessive force claim Montgomery must establish "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Ontiveros v. City of Rosenberg, Tex., 564 F.3d 379, 382 (5th Cir. 2009). Interestingly, the Deputies focus exclusively on whether it was clearly excessive for them to use the taser and ignore Montgomery's allegations that they punched or hit him. Focusing exclusively on

---

[6] In the Court's first order denying qualified immunity, it concluded that Montomgery's § 1983 claim was an excessive force claim.

the tasing is curious because the physical injuries enumerated in the Amended Complaint—a broken nose, lacerations, and multiple abrasions to his face, back, and head—are injuries that would result primarily from their alleged beating of Montomgery. See Amended Complaint ¶ 12. In fact, in his deposition Montgomery alleges that most of those injuries occurred when the Deputies hit him. See Montgomery Depo. 33-36. But even more puzzling is Montgomery's response, which also focuses on the reasonableness of the tasing and only once—and even then, vaguely—refers to the Defendants hitting him. See Pl.s' Br. at 8, docket no. 53. It is not clear whether Montgomery's failure to reference this testimony is related to the Defendants' Motion to Dismiss for Violation of Federal Rule of Civil Procedure 37 [**docket no. 45**], which was filed contemporaneously with their qualified immunity motions. Whatever the cause, in his response briefs Montgomery clearly distances himself from the more inflammatory claims contained in his deposition.[7]

---

[7] The Defendants contend that Montgomery's testimony is so unbelievable that he violated the Court's discovery rules and should be sanctioned with dismissal of his case. Sanctions aside, while a district court generally should refrain from making credibility assessments at the summary judgment stage, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), the United States Supreme Court has stated that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). This case presents somewhat of a "Scott situation," Anderson v. McCaleb, 480 F. App'x 768, 771 (5th

If the Deputies' use of the taser is the force in question, Montgomery fails to overcome the Defendants' qualified immunity defense at the first step, that is, he cannot show that his injuries were caused by the Deputies' use of that force. Ontiveros, 564 F.3d at 382. In his deposition, Montgomery never claims that his physical injuries resulted directly or indirectly from the tasing. Conceivably, Montgomery could have suffered "lacerations" from the taser's prongs or "abrasions" if he fell to the ground from the taser's shock. But he does not claim to have suffered any of his injuries in this way. He attributes the more serious of the injuries in the Complaint—a broken nose and abrasions to his face—to the Deputies' alleged beating of him. Without any specific testimony to connect the force to the injury, he cannot overcome the Deputies' claim for qualified immunity. As for the injuries as they relate to the alleged beating, Montgomery's claim survives at step one.

Even so, Montgomery also fails to overcome the Defendants' qualified immunity defense at the third step, regardless of the

---

Cir. 2012), as most of the video evidence and a good portion of Scott's eyewitness testimony clearly discredits Montgomery's testimony to the point where no reasonable juror could believe him. But because there is no direct evidence which contradicts Montgomery's story about what happened in the woods, the Court cannot fully rely on Scott's rationale, with the notable exception of whether Montgomery fell onto a rock. Regardless, the Court need not discredit any of Montgomery's testimony to rule on the Defendants' qualified immunity defense because he has failed to provide testimony indicating that the Deputies' actions were objectively unreasonable.

type of force in question. First, it is easy to determine whether the decision to tase Montgomery was clearly unreasonable. Heggins testified that he tased Montgomery because he was attempting to escape from Hollingsworth, who was trying to handcuff him. Montgomery never disputes this story. In fact, when pressed on any details that might overcome the Deputies' claim that the tasing was in direct response to his resistence to being handcuffed, Montgomery simply claims that he was "unconscious" at the time. Either he remembers what happened, or he does not. He cannot contend that the Deputies should not have tased him and yet maintain that he does not know whether he was struggling or attempting to escape the Deputies' grasp. Because Montgomery does not provide any details to corroborate his vague allegations of excessive force related to the use of the taser,[8] the Court cannot accept Montgomery's argument that its use was objectively unreasonable.

Likewise, the Court cannot conclude from Montgomery's muddled

---

[8] As for Scott's testimony that she believes Montgomery was tased several or five times, this belief is based purely on hearing the "Zzz" sound multiple times. The Court need not address whether multiple "Zzz" sounds accompany one "tasing," or whether each individual "Zzz" sound represents a different "tasing." It is enough to note that Scott appears to rely on the later understanding to formulate her belief that Montgomery was tased "several" times, and that understanding is not necessarily inconsistent with the Defendants' testimony—or Montgomery's testimony for that matter (at least viewed in light of the details he provides). More to the point, Scott testified that the Deputies warned Scott "to get down" before using the taser.

story that the Deputies' use of physical force—if the Deputies did indeed use other physical force—was objectively unreasonable. Montgomery genuinely may believe that his behavior did not warrant the use of any force. He may even believe that the Deputies intended to harm him by striking him with their fists or their flashlight. But he offers nothing more than his belief to substantiate these claims. What is clear—and uncontradicted by Montgomery—is that when Hollingsworth arrived at the scene and attempted to question Montgomery, he fled into the woods. From this, the Court can conclude that Hollingsworth did not act unreasonably by pursuing him. As for what happened in the woods, first of all, Montgomery definitely ran into some kind of concrete object.[9] At some point thereafter, Hollingsworth attempted to handcuff him. Montgomery never claims that he ceased to struggle with the Deputies at any point before they were able to subdue him by using the taser or even by "hitting" him. The Defendants

---

[9] Hollingsworth testified that he saw it happen. Scott testified that she saw blood on the rock the next morning. And less than ten minutes after his arrest, Montgomery admitted that his head injury was caused when he ran into the object. Certainly, Montgomery could explain away that admission, but any explanation would require him not only to give a plausible alternative cause of his injuries but also explain why his admission is unbelievable. He does neither. His default explanation that he was "unconscious" at the time of his admission is not convincing, Mont. Depo. at 68, particularly because he does not appear to be "unconscious" while he is asking Scott and the Deputies to look for his sister's phone in the woods because "[he] just got that phone today." Montgomery was conscious enough to give the Deputies his sister's phone number so they could locate that phone. Video Transcript at 8-9.

handcuffed him *after* they allegedly punched or hit him. This fact corroborates the Deputies' claim that they only used force necessary to restrain him. Montgomery's vague accusations based upon his subjective belief, unsupported by any other evidence in the record, are insufficient for the Court to conclude that Montgomery has carried his burden of showing that no reasonable deputy could have believed that the Defendants' actions were proper. Brown v. Callahan, 623 F.3d 249 (5th Cir. 2010) (citing Babb v. Dorman, 33 F.3d 472, 477 (5th Cir. 1994)).

*B. Heck v. Humphrey*

As for the Defendants' Heck v. Humphrey argument, in its earlier opinion, the Court recognized that Heck v. Humphrey, 512 U.S. 477 (1994), had been applied to bar excessive force claims but, because there were few facts in the record, expressed its concern over whether Heck v. Humphrey barred Montgomery's claims. See Montgomery v. Warren County, 2011 WL 6781020, at *4 (S.D. Miss. Dec. 27, 2011) (quoting Arnold v. Town of Slaughter, 100 F. App'x 321, 323 (5th Cir. 2004)). Having reconsidered the matter, the Court suggests that, here, a Heck analysis is either ancillary or redundant to the above qualified immunity analysis, which was based on the fact that Montgomery resisted the Deputies' attempt to arrest him. To explain, Heck may have had some added significance

14

if Montgomery had testified that he did not resist arrest.[10] <u>See</u> <u>Bolton v. City of Gulfport ex rel. Schloegel</u>, 2012 WL 6094770, at *11 (S.D. Miss. Dec. 7, 2012). If he had, <u>Heck</u> at the very least could be cited to estop Montgomery from disputing the facts that underlie his resisting arrest conviction. <u>See</u> <u>Nelson v. Jashurek</u>, 109 F.3d 142, 146 (3rd Cir. 1997) (explaining that a resisting arrest conviction is pertinent to an excessive force claim even if it may not bar that claim under <u>Heck</u>). But Montgomery has never claimed that he was not resisting arrest. While it is true that a conviction for resisting arrest is often a good indicator that the amount of force used by an arresting officer is reasonable, <u>see</u> <u>Bolton</u>, 2012 WL 6094770, at *11 ("[S]everal decisions by the Fifth Circuit indicate that <u>Heck</u>'s favorable termination rule generally bars excessive force claims where the plaintiff has been convicted of resisting arrest."), <u>Heck</u> requires an "analytical" and "fact-intensive" inquiry, <u>id.</u> at *11 (quoting <u>Bush v. Strain</u>, 513 F.3d 492, 497 (5th Cir. 2008), which is almost identical to the qualified immunity analysis conducted above.

---

[10] To be clear, Montgomery does state that he did not try to get away when the Deputies were putting the handcuffs on him. But he appears to be describing the situation after the struggle and tasing. Mont. Depo. at 41. He never disputes the Deputies' story that he was fighting with them, other than to claim that he could not have resisted them because he was "unconscious." In other words, he never accounts for what happened before he became "unconscious" or gives the Court any indication that there was no need for the Deputies to take actions that may have rendered him "unconscious," that is, to use force to arrest him.

To repeat those facts as they relate to his conviction, on November 26, 2009, Montgomery fled from Hollingsworth and fought with Hollingsworth and Heggins while they tried to arrest him. Although the abstract of the conviction does not specifically say so, these facts must form the basis of the resisting arrest conviction. The abstract shows that the violation occurred on November 26, 2009 and that Hollingsworth filed the charge. See Abstract of Court Record, docket no. 8-1. There is no indication that Montgomery had a different encounter with Hollingsworth on that date. In fact, Montgomery has not denied that his excessive force claim stems from events different from the ones that underlie his resisting arrest conviction. Because Montgomery was found guilty of resisting arrest in connection with this incident but does not or cannot say at what point he stopped resisting arrest (which would theoretically trigger the notion that the Deputies' subsequent use of force was excessive), the Court must conclude that the Deputies' use of force was entirely related to Montgomery's illegal behavior. Under this specific set of facts, Fifth Circuit precedent indicates that Montgomery's excessive force claim would necessarily imply the invalidity of his resisting arrest conviction, and for this reason also, Montgomery's excessive force claims should be dismissed. See Bolton, 2012 WL 6094770, at *11 (concluding that the plaintiff's excessive force claim was barred under Heck because it was not "temporally" or "conceptually"

distinguishable from her resisting arrest conviction).

## II. State Law Claims

For similar reasons, the Defendants are also entitled to immunity from Montgomery's state law claims. The Mississippi Tort Claims Act (MTCA) provides immunity from claims "[a]rising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." Miss. Code Ann. § 11-46-9(1)(c). As is clear from the discussion above, the Deputies were acting in the scope of their employment and were engaged in a police activity at the time the state-law claims arose. Further, Montomgery was engaged in criminal activity at the time of his encounter with the Deputies, and this activity has a direct "causal nexus" with the actions for which he now seeks to recover in tort. See City of Jackson v. Perry, 764 So. 2d 373, 379 (Miss. 2000). There is no question that the MTCA was designed to provide immunity to officers from claims arising out of a valid arrest, see id., and therefore the Defendants are immune from Montgomery's civil assault and battery and intentional and/or negligent infliction of emotional distress claims.

### ORDERS

**IT IS THEREFORE HEREBY ORDERED** that Defendant Hollingsworth's

17

Motion for Summary Judgment [**docket no. 41**] is **GRANTED. IT IS FURTHER ORDERED** that Defendant Heggins's Motion for Summary Judgment [**docket no. 43**] is **GRANTED. IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss for Violations of Federal Rule of Civil Procedure 37 [**docket no. 45**] is **DISMISSED** as moot.

Additionally, Montgomery has sued Warren County but has not alleged any claims in the Amended Complaint that would suggest liability, e.g., a § 1983 failure-to train claim. It is unclear why Defendants' counsel has not moved for summary judgment in Warren County's favor, but it appears to be warranted. Pursuant to Federal Rule of Procedure 56(f), this Court has the authority to grant judgment independent of a motion if it provides reasonable time for the Plaintiff to respond. The Court hereby gives notice to the Plaintiff that the Court is inclined to grant summary judgment in favor of Warren County on the ground that he has not alleged any viable theory of liability against it. The Court hereby provides the Plaintiff fourteen (14) days to **SHOW CAUSE** why summary judgment should not be granted in favor of Warren County.

So **ORDERED,** this the 14th day of July, 2013.


       /s/ David Bramlette
       **UNITED STATES DISTRICT JUDGE**